[Cite as *State v. McBride*, 2020-Ohio-559.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO

  Plaintiff-Appellee

-vs-

LARRY MCBRIDE

  Defendant-Appellant

JUDGES:
Hon. William B. Hoffman, P. J.
Hon. W. Scott Gwin, J.
Hon. John W. Wise, J.

Case No. 2019CA00038

O P I N I O N

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Criminal Appeal from the Court of Common Pleas, Case No. 2018CR01130 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | February 18, 2020 |

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
PROSECUTING ATTORNEY
KRISTINE W. BEARD
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

DONOVAN HILL
116 Cleveland Avenue, NW
Suite 808
Canton, Ohio 44702

*Wise, J.*

**{¶1}** Appellant Larry McBride appeals his conviction on one count of murder and one count of felonious assault following a jury trial in the Stark County Court of Common Pleas.

**{¶2}** Appellee is the state of Ohio.

## STATEMENT OF THE FACTS

**{¶3}** Appellant, Larry McBride was indicted by the Stark County Grand Jury for one count of Murder, in violation of R.C. §2903.02(B) and one count of Felonious Assault, in violation of R.C. §2903.11(A)(1) and/or (2).

**{¶4}** The relevant facts and procedural history are as follows:

**{¶5}** Appellant Larry McBride lived in a secured, multi-unit apartment dwelling. Other apartment tenants included James and Holly Yeager and their children, and Holly's father Dwight Reel. Darrell Deubel is a neighbor who lived across the street. The incident in question occurred on the building's front porch, a common area where friends and residents gather.

**{¶6}** On June 13, 2018, McBride and the Yeager family were sitting on the front porch. Dwight Reel, was in the back of the building, preparing a bonfire for a children's event. Deubel, aka Raven, the neighbor who lives across the street, was wearing a kilt which was being held up by a belt. On the belt, Deubel prominently attached a knife contained in a sheath. Dwight Reel, who was also the maintenance person for the building, saw Deubel's outfit and expressed his concern to Deubel, telling him to leave because he could not be present, wearing the knife, where children were gathered. (T.1 at 12).

**{¶7}** Deubel approached the porch and said he was leaving to get beer and cigarettes. McBride asked Deubel to get him a pack of cigarettes, gave Deubel money and Deubel left. When Deubel returned, he had forgotten the McBride's cigarettes and made a second trip to the store returning with cigarettes for McBride. Thereafter, everyone sat on the front porch drinking and talking. (T.1 at 15, 202-204).

**{¶8}** At some point during the evening McBride got into a disagreement with Deubel about how to raise children. Holly Yeager was concerned that the argument was getting heated and took her children inside. (T.1 at 205). McBride, who had been sitting in a wheelchair, went inside to his apartment, put on his prosthetic leg, got his walker, and a knife and went back outside. (T.1 at 206-207). James Yeager testified that he asked Deubel at least three times to go home and work out any disagreements the next day. (T.1 at 208). Yeager testified that when Deubel finally turned to walk away, McBride asked him for a light. Yeager testified that Deubel turned toward McBride and continued to be belligerent. McBride immediately stood up, Deubel pushed McBride and McBride reached out and stabbed Deubel in the throat. (T.1 at 209-210).

**{¶9}** Deubel then grabbed his cigarettes and beer, and grabbing his neck, ran across the street toward his home. (T.1 at 211). Yeager testified that he ran with Deubel and was not aware of the extent of the injuries until he saw blood running through Deubel's fingers. (T.1 at 211). When Deubel reached his porch he collapsed. (T.1 at 213-214). Yeager testified that Deubel was bleeding profusely and that he started pulling things off Deubel's belt trying to find Deubel's cell phone to call for help. (T.1 at 215). Once he located the cell phone he couldn't figure out how to unlock the phone so he ran back home and told Holly to call 911.

{¶10} Holly Yeager testified that, while they were talking on the porch, McBride told Deubel that it wasn't legal to carry a knife in plain view. Deubel got upset, and they started to raise their voices. She stated that McBride left and went into his apartment. Deubel remained outside on the porch talking with James. (T.1 at 33-34). Holly stated that when McBride came back outside he was no longer in the wheelchair, instead he was wearing his prosthetic leg, using a walker, and carrying a knife. (T.1 at 35). She said she proceeded to take the kids inside because she was concerned about a possible altercation. (T.1 at 37). After she went inside, she became concerned and peaked through the curtains. She saw Deubel shove McBride and then saw McBride stab Deubel in the neck. (T.1 at 39). She testified that after the stabbing, McBride knocked on her door and told her to call 911 because he had just stabbed a guy. (T.1 at 41).

{¶11} Dwight Reel also heard the commotion, saw Deubel lying on his own front porch, and saw blood on the front porch of the apartment building. Reel unlocked the common front door, entered the building, and saw McBride telling Holly that he had just stabbed someone. (T.1 at 16).

{¶12} After talking with McBride, Holly went outside, saw blood on the porch, and saw Deubel on his front porch. Initially she thought everything was all right and poured water on the blood-stained porch. She realized things were serious when James, who was covered in blood, ran across the street and told her to call 911. (T.1 at 41-43).

{¶13} On cross-examination, Holly testified that, approximately a week earlier, James and Deubel were in Deubel's home. She and McBride were outside and heard arguing. Later she saw a lot of blood from Deubel's house to theirs and assumed that Deubel had cut her husband with a knife. (T.1 at 48, 53). She admitted that no one called

the police, nobody went to the hospital, and that her husband continued to hang out with Deubel. (T.II at 57). James Yeager testified that when he was at Deubel's house, he was intoxicated, started playing around with Deubel's knives and accidentally cut his own hand. (T.1.at 220).

{¶14} Several Alliance police officers responded to the scene of the stabbing, Officer McCord testified that he responded to Deubel's residence, saw a puncture mark in Deubel's neck and observed Deubel laying in a pool of blood. (T.1 at 168-169). He made arrangements to transport Deubel to Alliance hospital, where Deubel was pronounced dead. (T.1 at 170-171).

{¶15} Officer Palazzi testified that he also was dispatched to the scene. (T.1 at 181). Upon arrival, he located McBride standing in the hallway in front of his apartment, with his keys in his hand, trying to unlock the deadbolt to his apartment. (T.1 at 182-183). McBride was handcuffed, taken into custody and advised of his Miranda rights. (T.1 at 184). Upon being asked what happened earlier, McBride told Officer Palazzi that Deubel had a knife hanging at his side, that Deubel said he was going to beat his ass, and then rushed him, and that he stabbed Deubel. (T.1 at 190). Officer Palazzi recalled that McBride was cooperative, and that he led the officers to the blood covered knife. (T.1 at 185-186).

{¶16} In a later statement, McBride told Detective Mark Welsh that Deubel ran into the knife. (T.1 at 258).

{¶17} Detective Johnson testified that McBride was approximately 5'11" tall.

{¶18} Renee Robinson, a forensic pathologist, performed Deubel's autopsy. She testified that at the time of his death, Deubel was 37 years old, weighed 165 pounds and

stood 5 '9" tall. Dr. Robinson testified that Deubel had a blood alcohol level of .193 and was positive for THC. During the external exam Dr. Robinson observed a 1" wound in the left side of Deubel's neck. (T.1 at 82-83). She testified that Deubel had a sharp stab wound that pierced through the soft tissue on the left side of his neck and muscles. She testified that the stab wound then traveled through the midline of Deubel's neck cutting his subclavian vein under the collar bone and continuing into his chest cavity and right lung. (T.1 at 86-88, 90). She testified that the total depth of the cut was 8".

{¶19} She stated that the cut disrupted two vessels that carry blood, the subclavian vein and the lung, which caused copious amounts of blood to collect in Deubel's chest cavity, lung and windpipe. (T.1 at 89, 91). Dr. Robinson testified that she collected two liters of blood from Deubel's chest cavity, and that this loss of blood was fatal. (T.1 at 89-90). Dr. Robinson further testified that skin is one of the toughest organs in the body and that there was a significant degree of force involved in the injury. She said,

> Not only did it penetrate the skin, but it was able to go through some
> muscle, some cartilage, make a mark on a bone, you know, go to the other
> side of the body, and do some destruction to the vessel, and to the lung ...
> it was a very long path.

{¶20} (T.1 at 95-06).

{¶21} Dr. Robinson testified that it is highly unlikely, that the wounds were caused by somebody running into a knife. (T.1. at 96-97).

{¶22} At the conclusion of the trial, the jury found Appellant guilty as charged.

{¶23} At the sentencing hearing, the State moved to merge the Felonious Assault

conviction with the Murder conviction. The trial court sentenced McBride to serve a prison sentence of 15 years to life.

{¶24} It is from this conviction and sentence that Appellant now appeals, raising the following error for review:

ASSIGNMENT OF ERROR

{¶25} "I. THE DEFENDANT'S CONVICTION FOR ONE COUNT OF MURDER AND ONE COUNT OF FELONIOUS ASSAULT WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I.

{¶26} In his sole assignment of error, Appellant argues that his convictions were not supported by the manifest weight or sufficiency of the evidence. We disagree.

{¶27} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶28} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485

N.E.2d 717 (1st Dist.1983). *See also, State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶29}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flicking*, 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

**{¶30}** "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, 2003 WL 21291042, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).

**{¶31}** As set forth above, Appellant was charged with and convicted of murder, in violation of R.C. §2903.02(B) and felonious assault in violation of R.C. §2903.11(A)(1) and/or (A)(2), as follows:

**R.C. §2903.02 Murder**

\*\*\*

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

**R.C. §2903.11 Felonious assault**

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶32} Physical harm is any injury or illness, regardless of gravity or duration. R.C. §2901.01(A)(3).

{¶33} Appellant does not assert that the state failed to prove any of the elements of murder or felonious assault upon which he was convicted. Rather, Appellant's challenge is based upon his contention he proved his claim of self-defense by a preponderance of the evidence.

{¶34} "Self-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each element by a preponderance of the evidence.' " *State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 10 (3d Dist.), quoting *State v. Kimmell*, 3d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 19. (Other citations omitted.) "Affirmative defenses such as self-defense ' "do not seek to negate any elements of the offense which the State is required to prove" but rather they "admit[ ] the

facts claimed by the prosecution and then rel[y] on independent facts or circumstances which the defendant claims exempt him from liability." ' " *Id.* at ¶ 10, quoting *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 32, quoting *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986).

**{¶35}** A sufficiency-of-the-evidence review does not apply to affirmative defenses because such a review does not consider the strength of defense evidence. *Id.,* citing *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 37. As noted above, a claim of insufficient evidence challenges the sufficiency of the state's evidence. Accordingly, Appellant may not challenge the trial court's rejection of his self-defense claim on sufficiency of the evidence grounds. *Id.,* citing *State v. Cooper,* 170 Ohio App.3d 418, 2007-Ohio-1186, ¶ 15; *Rankin* at ¶ 17 ("The 'due process "sufficient evidence" guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime.' ").

**{¶36}** Appellant's self-defense contentions are therefore more properly considered in a manifest weight of the evidence context.

**{¶37}** To establish self-defense, Appellant had to prove (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that he did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Having reviewed the record, we cannot conclude that the jury lost its way when it rejected Appellant's claim of self-defense.

**{¶38}** The testimony at trial established that Appellant asked the victim to get him a pack of cigarettes, therein inviting him onto the porch. Appellant then left the porch, went to his own apartment where he put on his prosthetic leg, exchanged his wheelchair for a walker, and armed himself with a large knife. Appellant then returned to the porch with the knife. When the victim started to leave the porch, Appellant called him back to light his cigarette. When an altercation began by the victim shoving Appellant, Appellant responded by stabbing the victim, burying a seven inch blade eight inches into the victim's neck. The witnesses testified that at no time during the evening did they hear the victim threaten Appellant, and that at the time of the assault the victim never pulled his knife from its sheath on his belt.

**{¶39}** Here, the jury was free to accept or reject any and all of the evidence offered by the parties and assess the credibility of the witnesses. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. McGregor,* 5th Dist. Ashland No. 15–COA–023, 2016–Ohio–3082, 2016 WL 2942992, ¶ 10, citing *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 2000 WL 297252 (Mar. 23, 2000). Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

**{¶40}** Our review of the entire record reveals no significant inconsistencies or other conflicts in the state's evidence which would demonstrate such a lack of credibility of any individual witness that caused the jury to lose its way in reaching its verdict.

**{¶41}** Based on the foregoing, we find that the state proved that Appellant committed the crimes of murder and felonious assault, and that said convictions were not against the manifest weight of the evidence.

**{¶42}** Appellant's sole assignment of error is overruled.

**{¶43}** For the reasons stated in the foregoing opinion, Appellant's conviction entered in the Stark County Court of Common Pleas is affirmed.

By: Wise, J.

Hoffman, P. J., and

Gwin, J., concur.

JWW/d 0206